**EMECO INDUSTRIES, INC.**

**v.**

**The UNITED STATES.**

**No. 547–71.**

United States Court of Claims.

Oct. 17, 1973.

Alexander M. Heron, Washington, D. C., atty. of record, for plaintiff. Murray S. Simpson, Jr., Pope, Ballard & Loos, Washington, D. C., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on plaintiff's motion, filed August 23, 1973, for judgment and for adoption of the recommended decision filed May 30, 1973, by Trial Judge Joseph V. Colaianni pursuant to Rule 134(h), defendant having withdrawn its previously filed

notice of intention to except to said decision. Upon consideration thereof, without oral argument since the court agrees with the Trial Judge's decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

### OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

The claim in this case arises from a September 24, 1969, solicitation from defendant, acting through the Federal Supply Service of its General Services Administration, hereinafter referred to as "GSA," for the manufacture of 31,896 index card boxes. The solicitation indicated that the boxes were to be delivered in varying specified quantities to 1,500 addresses, and bids were requested F.O.B. destination.

Following the bid opening, defendant on October 16, 1969, requested a plant inspection report to determine if plaintiff's facilities were capable of producing the entire 31,896 boxes within the time specified by the solicitation. The inspection was completed on October 24, 1969, and the report indicated that plaintiff was capable of performing the contract within the 70 days required by the contract, notwithstanding that plaintiff had never manufactured index card boxes before. The report further noted that plaintiff had made arrangements to purchase four dies, at a total cost of $10,300, which were essential in order for it to manufacture the boxes. The dies were to be delivered within 30 days after defendant had approved plaintiff's preproduction sample.

In the meantime, although unknown to plaintiff, defendant on October 17, 1969, received a late bid from Art Steel Com-

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed May 30, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion. KUNZIG, Judge, took no part in the consideration and decision of this case.

pany, Inc. On October 22, 1969, following an investigation, defendant's contracting officer concluded that the late receipt of Art Steel's bid was due solely to a delay in the mail and that the bid should therefore be considered for award. Art Steel offered to build boxes to defendant's specifications at a price of $2.78 each, but limited its bid by the following clause, to only 29,183 boxes:

Bidding on quantity less than specified, in accordance with provision contained in paragraph 10C of Standard Form 33A. Bid covers all quantities specified except 2,713 boxes for Navy requirements * * *.

The fact that Art Steel's offer to manufacture and ship 29,183 boxes was low was not communicated to plaintiff or any of the other six bidders whose offers had been opened on October 14, 1969.

Further, although the date of its occurrence is not established in the record, there is no doubt that the contracting officer signed plaintiff's offer to supply the entire quantity of boxes. Equally well established, however, is the fact that the signed contract was never delivered to plaintiff. The record also indicates that defendant originally intended to award the entire contract to a single bidder. However, following the receipt of Art Steel's late bid, the contracting officer apparently decided that it would be in the best interest of the Government to split the award between plaintiff and Art Steel. The offerors whose bids had been opened on October 14, 1969, were not told of defendant's intention to split the award.

Plaintiff on December 8, 1969, received defendant's December 3, 1969, purchase order for 2,713 boxes, representing the entire requirement of the Navy, at a total price of $8,247.52. The 2,713 boxes were to be shipped to 1,355 of the contract's 1,500 destinations. Immediately upon receipt of the purchase order, plaintiff set about to manufacture a preproduction sample by hand. After receiving defendant's approval of its preproduction sample, plaintiff began placing orders for the necessary dies. The dies and other necessary tooling were on hand by February 1970. Plaintiff had also, by December 16, 1969, begun to place orders for the necessary material for the production of the entire quantity of 31,896 boxes, and by February 23, 1970, all of the necessary material had been ordered.

Plaintiff began producing boxes on February 4, 1970. The 2,713 boxes covered by the December 3, 1969, purchase order were completed and delivered to the specified destinations within the agreed time. Plaintiff, however, did not discontinue production upon completion of the 2,713 boxes. Plaintiff, apparently with an eye towards manufacturing all of the 31,896 boxes called for by defendant's original solicitation, instead continued with the production of the remaining number of boxes.

During early March of 1970, while checking a delivery requirement with the Department of Defense, plaintiff accidentally, and for the first time, learned that defendant had placed an order for the remaining 29,183 boxes with Art Steel Company, Inc. Plaintiff immediately stopped its production process, but by this time it had already completed some 6,000 boxes over the 2,713 required by defendant's purchase order. In addition, plaintiff wrote a letter of protest to the defendant.

In an exchange of letters that followed, plaintiff learned of Art Steel's late bid to manufacture 29,183 boxes for delivery to the 145 destinations at a price of $2.78 each. Plaintiff was further advised that Art Steel's bid was determined to have been timely, since the delay in its arrival was found to be the fault of the Post Office. Defendant further advised plaintiff that Art Steel's bid, although not directed to the entire quantity of boxes stated in the solicitation, was still felt to be responsive since a partial bid was authorized by article 10(c) of the instructions that accompanied the solicitation. Defendant went

on to admit that it had originally intended to award the entire contract at a single price to a single bidder, but that upon reflection it was felt to be in the Government's best interest to resort to a split award between plaintiff and Art Steel. After failing to resolve the matter on an informal basis, plaintiff filed suit in this court on July 19, 1971.

The questions which must be resolved are whether plaintiff was justified under the circumstances of this case in incurring expenses which would only have been required and necessary if it had been awarded a contract for manufacturing the entire quantity of boxes covered by defendant's solicitation, and, if it was, what is it entitled to recover?

### I. Solicitation did not Preclude Split Awards

Plaintiff, in the main, argues that the solicitation as written was intended to obligate defendant to purchase the entire quantity of 31,896 boxes from a single source. Building on that theme, plaintiff argues that the solicitation was for a definite quantity and that a split award was therefore not permitted. In support of its position, plaintiff initially points to the schedule section of the solicitation which contains the following notation under the "Supplies/Services" column:

Definite Quantity Contract for FSC Class 7520—Box, Index Card

In addition, plaintiff argues that the continuation page of the solicitation was set up to require a single bid on the definite quantity of 31,896 boxes. Plaintiff further contends that defendant, by its own admission, intended to award the contract to a single bidder.

Finally, plaintiff argues that if the contract can be construed to permit partial awards to more than one source, it is ambiguous and defendant, as author of the contract, should suffer the consequences.

Defendant argues that the intention to award the contract to a single bidder does not appear in the solicitation, and that in any event—

* * * in view of the fact that Art Steel's bid was responsive and low, the contracting officer had no choice except to make the award to Art Steel up to the limitation specified in * * * [Art Steel's] bid, as well as the * * * award to plaintiff for the balance of the quantity.

Defendant further contends that article 10(c) of the solicitation was designed to permit a bidder to place limitations on the quantities bid, and to reserve to the Government the right to make awards on such a basis unless the bidder otherwise specified in its bid.

██ A careful reading of article 10(c) supports defendant's position. In the first place, the article clearly allows the Government to—

* * * accept any item or group of items of any offer, unless the offeror qualifies his offer by specific limitations.

Plaintiff placed no limitations on its bid. Going on, the article further provides that the—

* * * Government reserves the right to make an award on any item for a quantity less than the quantity offered at the unit prices offered unless the offeror specifies otherwise in his offer.

Again plaintiff placed no conditions on its bid, and in the light of this defendant made an award to plaintiff for 2,713 boxes instead of the entire quantity of 31,896. Furthermore, plaintiff's argument that article 42, entitled "All or None" bids of the GSA supplemental provisions, prevented it from limiting its bid to an "all or none" offer, is incorrect. That article clearly was intended to limit the use of an "all or none" bid in requirements and indefinite quantity contracts. Since the solicitation in question is entitled a definite quantity contract, article 42 was clearly not applicable, and plaintiff could have conditioned or limited its offer.

Further, plaintiff's argument alleging an ambiguity in the terms of the solicitation is found to be unpersuasive. An objective reading of the entire contract fails to indicate the existence of an ambiguity with respect to the specifications. Article 10(c) clearly, and in bold face type, informs the bidders of their right, in the absence of language to the contrary in the schedule section of the solicitation, to submit offers on less than the quantity specified. Nothing in the schedule of the solicitation in question conflicts with the option given to the bidders by article 10(c). It is, accordingly, concluded that the terms of the specifications are clear and unambiguous.

In sum, there is nothing in the solicitation which precluded defendant from making a split award to both plaintiff and Art Steel Company, Inc.

## II. Parties Did Not Enter Into a Formal Contract for Manufacture and Delivery of 31,893 Boxes

Plaintiff makes much of the fact that defendant's contracting officer signed the solicitation which plaintiff had filled out, signed, and submitted in time for the October 14, 1969, bid opening. Plaintiff contends that the signing of its solicitation by defendant's contracting officer amounts to an acceptance by defendant of its offer. Defendant, on the other hand, points out that a signed copy of plaintiff's solicitation has never been delivered to plaintiff. Defendant then argues that a binding contract cannot come into existence if defendant's acceptance was never communicated to the offeror. While the record is not clear, it appears that plaintiff was not aware that defendant had signed its solicitation until after the split awards to both it and Art Steel for the manufacture of the 31,896 boxes had been made.

Plaintiff's argument is unpersuasive, for while there is no single or best way for an acceptance to be communicated to an offeror, there is no doubt that an acceptance must be communicated. In a case involving a similar issue, this court, after a thorough review of relevant law, held that communication of an acceptance must be made before a valid contract can come into being. See Slobojan v. United States, 136 Ct.Cl. 620 (1956). Specifically, this court stated, at p. 626:

The Federal courts follow the principles set forth above and hold that where the validity of a bilateral contract is involved it is necessary that acceptance of the offer be communicated to the offeror before a valid and binding contract is made. Burton v. United States, 202 U.S. 344, 384–385, [26 S.Ct. 688, 50 L.Ed. 1057] (1906); Dickey v. Hurd, 33 F.(2d) 415, 418 (C. A. 1, 1929), certiorari denied, 280 U. S. 601 [50 S.Ct. 82, 74 L.Ed. 646]; Barnebey v. Barron G. Collier, Inc., 65 F.(2d) 864, 868 (C.A. 8, 1933); Shubert Theatrical Co. v. Rath, 271 Fed. 827, 833–834 (C.A. 2, 1921). * * * This court has recently held that even if a letter containing an acceptance of an offer is mailed, the acceptance is not final until the letter reaches its destination, and can be withdrawn at any time prior to receipt by the offeror. Rhode Island Tool Company v. United States, 130 C.Cls. 698, 128 F. Supp. 417 (1955); Harvey Franklin Dick v. United States, 113 C.Cls. 94, 82 F.Supp. 326 (1949).

Plaintiff also argues that the purchase order for 2,713 boxes was merely defendant's way of making payment, and that a contract nonetheless existed for the definite quantity of 31,896 boxes. In support of its position, plaintiff points to box 27 of the solicitation, which is entitled "Payment Will Be Made By" and contains the insertion "To Be Shown On Orders Issued Under This Contract."

The mere statement of the proposal indicates the fallacy of plaintiff's position. The quoted language does indeed suggest a program by which payments were to be made, but that program presupposed the existence of a contract. As has been previously pointed out, no

contract for 31,896 boxes was ever entered into by plaintiff and defendant.

 In sum, it is concluded that the mere signing of plaintiff's offer by defendant's contracting officer did not result in a contract authorizing plaintiff to manufacture 31,896 recipe card boxes.

### III. Defendant is Estopped to Deny the Existence of a Contract With Plaintiff for 31,896 Boxes

 The final question to be considered is whether or not sufficient grounds exist for applying the doctrine of equitable estoppel against the defendant. The recent case of Manloading & Management Assoc., Inc. v. United States, 461 F.2d 1299, 198 Ct.Cl. 628, (1972), indicates that this court will, in appropriate cases, apply that doctrine to prevent defendant from denying the existence of a contractual agreement. In order to establish an estoppel it is necessary for plaintiff to show, as this court has previously held in the case of Stevens Manufacturing Co. v. United States, 8 F.Supp. 720, 80 Ct.Cl. 183, 192–193, (1934), that:

> * * * the party against whom an equitable estoppel is set up acquiesced in the transaction in such a manner as to change the relationship of the parties and make its repudiation of the proceedings contrary to equity and good conscience.

It is not, however, essential that the party against whom an estoppel is urged to have made a representation of any kind. See Robbins v. United States, 21 F.Supp. 403, 86 Ct.Cl. 39 (1937). This latter view is in accord with those cases that hold that a party who engages in a course of conduct, even without misrepresentation, upon which another party has a right to believe he is intended to act or upon which the first party intends him to act, will be estopped from repudiating the effect of such conduct. See United States v. Georgia-Pacific Co., 421 F.2d 92, 96 (9th Cir. 1970). Of course, it is essential to a holding of estoppel against the United States that the

course of conduct or representations be made by officers or agents of the United States who are acting within the scope of their authority. See United States v. Georgia-Pacific Co., supra, at 100–101; Manloading & Management Assoc., Inc. v. United States, supra, 461 F.2d at 1302–1303, 198 Ct.Cl. at 634–635.

 After a complete consideration of the controversy between the parties, it is concluded, for reasons which follow, that grounds for estoppel against the defendant exist.

The court in Georgia-Pacific, supra, 421 F.2d at 96, indicated that the following four elements must be present in order to establish an estoppel:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

All of these essential elements are present in the case at bar.

### A. Defendant Knew the Facts

As has been previously discussed, only defendant knew all of the facts and the complete story surrounding the solicitation in question. It should be initially pointed out that plaintiff submitted the lowest of the six bids which were received in time for the October 14, 1969, opening. The fact that defendant on October 17, 1969, received a bid from Art Steel that had been delayed by the Post Office was not made known to plaintiff or any of the five other bidders. Further, plaintiff was not aware of the October 22, 1969, decision by defendant's contracting officer to consider Art Steel's bid in making the award. The failure of defendant to so inform plaintiff appears to be particularly regrettable since plaintiff's offer was the lowest received at the public bid opening of October 14, 1969, and plaintiff could therefore reasonably conclude that it

would be given the contract. In fact, the failure of defendant to notify plaintiff of the receipt of a lower successful bid is a violation of its own procurement regulation [1] dealing with such matters, and which provides in pertinent part that:

> (2) Notification of rejection also shall be given to any unsuccessful higher bidder where the circumstances were such that he may have had reason to believe he might receive an award, e. g., the bidder was requested to extend his bid acceptance time or clarify his bid, or the bidder knew that his bid was the lowest received by bid opening time (but the lower successful bid was received late).

Further support for plaintiff's expectations can reasonably be inferred from defendant's request of October 16, 1969, to its resident inspector at plaintiff's plant to conduct a plant facility survey to determine if plaintiff was capable of satisfactorily performing the contract requirements, i. e., building 31,896 boxes within 70 days after being awarded the contract. As plaintiff further points out, the preaward on-site inspection is significant since defendant's own published regulations indicate that it is not necessary in connection with contracts of less than $10,000.[2] Thus, plaintiff argues that the inspection was another reason why it could logically assume that it was being seriously considered to manufacture all 31,896 boxes.

Although the inspection was not completed until October 24, 1969, defendant made no attempt to inform plaintiff of Art Steel's late bid or to cancel the inspection because of the receipt of the late bid.

Furthermore, defendant was aware that plaintiff had never manufactured boxes before and that it was necessary for it to purchase dies at a cost of over $10,000 in order to be able to perform the contract. This is of particular importance since it is inconceivable that plaintiff would have incurred such an expense if it had known that it would only receive an $8,247.52 award.

Defendant obviously also knew that plaintiff's bid of $3.04 per box was an average that took into consideration the costs for manufacturing the 31,896 boxes, and, as well, the costs involved in shipping the boxes to the 1,500 addresses. It also goes without saying that defendant must have known that the Navy's portion of the solicitation, which called for 2,713 boxes to be sent to some 1,355 destinations, was the most costly and the least desirable segment of the contract.

### B. Plaintiff Had Right to Act in Reliance on Defendant's Conduct

From the facts outlined in section III(A), it is not necessary to consider if defendant and/or its representative intended that plaintiff act in reliance on defendant's actions and/or inactions, for it is clearly established that plaintiff had a reasonable right to act in reliance thereon. From all of defendant's actions or inactions, plaintiff could reasonably conclude that it was to receive the $96,963.84 contract for the entire quantity of boxes. It is only necessary to focus on a few of the above facts to illustrate why it was reasonable for plaintiff, being the low bidder at the October 14, 1969, bid opening, to assume that it would receive a contract for the entire quantity. Under the circumstances of this case, it is important to stress the failure of defendant to inform plaintiff of the receipt of Art Steel's late bid, for only when this is kept clearly in mind is one able to understand why plaintiff

---

1. 41 C.F.R. § 1–2.408, Information to bidders.

2. See 41 C.F.R. § 1–1.310–9, Pre-award on-site evaluation:

"(b) Pre-award on-site evaluations need normally not be performed when the information sources stated in § 1–1.310–7 yield sufficient data to enable a contracting officer to make a determination regarding the responsibility of a prospective contractor. Generally, pre-award on-site evaluations are not necessary in connection with contracts of less than $10,000."

acted as it did. Along the same line, it is important to refrain from evaluating plaintiff's acts from a hindsight vantage point, based on all the facts, since all the facts were not known to plaintiff at the time it acted.

At the time plaintiff received the $8,247.52 order for the 2,713 boxes, it was unaware of Art Steel's bid. In addition, the Government had concluded an on-site inspection, which is not normally done where contracts of less than $10,000 are involved. Further, defendant knew that plaintiff, not previously having manufactured such boxes, would have to purchase dies that cost several thousand dollars more than the $8,247.52 award. Under these circumstances alone, it was reasonable for plaintiff to conclude that the 2,713 box award, which dealt solely with the Navy's requirements, was only the first of several orders, and that it would shortly receive orders for the Army, Marine and Air Force requirements.

### C. Plaintiff Was Ignorant of True Facts

Plaintiff did not know of defendant's award to Art Steel to manufacture 29,183 boxes until, by chance, it was so advised in early March 1970. Until that time, plaintiff was under the impression that it had received the entire 31,896 box award. Moreover, by that time plaintiff had already procured the necessary dies, tooling and material to manufacture the entire quantity of boxes.

### D. Plaintiff Relied on Defendant's Acts to Its Detriment

The record clearly establishes that plaintiff relied on defendant's action and/or inaction to its detriment. Specifically, upon receipt of the 2,713 order, plaintiff immediately ordered dies at a cost of $10,300. In addition, since plaintiff reasonably assumed that the order was only the first, and that others would follow until all 31,896 boxes were manufactured, material for the production of the entire quantity was immediately or-

dered. As further justification for its action, plaintiff explains that the solicitation required the entire 31,896 boxes to be produced within 70 days. Accordingly, plaintiff concluded that it would have to immediately assemble all of the necessary material, if it hoped to meet the 70-day delivery schedule.

Of course, plaintiff stopped its manufacturing process in early March of 1970 when it learned of defendant's award to Art Steel for the remaining 29,183 boxes. But by this time it had already ordered and received all of the necessary material and tooling for completion of the entire quantity of boxes.

It is found that defendant knew all of the facts surrounding the placement of awards to both plaintiff and Art Steel, and plaintiff did not; that plaintiff had a right to act in reliance upon defendant's conduct; and that in reliance upon defendant's action plaintiff incurred expenses in connection with the necessary dies, tooling and material to manufacture 31,896 boxes. It is, therefore, concluded that defendant is estopped to deny the existence of a contract with plaintiff for 31,896 boxes.

### IV. Recovery

Having concluded that defendant is estopped to deny the existence of a contract with plaintiff for 31,896 boxes, it follows that plaintiff is entitled to recover. However, this court has already held in Manloading & Management Assoc., Inc. v. United States, *supra*, that in contracts, such as the one at bar, which contain a termination for convenience article, recovery must be calculated in accordance with that article and should not include prospective profits, or consequential damages. The parties have not addressed themselves to the question of what plaintiff is entitled to recover on the basis of the termination for convenience article, and, the record is accordingly devoid of the needed information to make the required calculations. It is, therefore, necessary that the amount of recovery be determined in

subsequent proceedings under Rule 131(c), unless the parties are able to reach an agreement on that point.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined in subsequent proceedings pursuant to Rule 131(c).