**Joseph CARAMUCCI, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 513–86T.**

United States Claims Court.

April 27, 1987.

Perry D. Litchfield, San Rafael, Cal., for plaintiff. John Starbuck, Oakland, Cal., of counsel.

Mary B. Seyferth, with whom were Asst. Atty. Gen. Roger M. Olsen, Mildred L. Weidman, and Gerald B. Leedom, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff, formerly an agent with the Internal Revenue Service ("IRS"), seeks reimbursement of independent counsel legal expenses he incurred in connection with defense of a civil action for alleged unlawful disclosure of taxpayer information. The action is currently before the court on defendant's motion for summary judgment. The court finds for the reasons discussed herein that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.

### I. *Factual Background*

The following facts are either not materially in dispute, or are drawn from plaintiff's contentions.

In August 1978 plaintiff was assigned to interview Morry Weinstein, a tax attorney who had been arrested for alleged drug offenses. After the interview, plaintiff referred Weinstein for investigation of possible tax fraud. Thereafter, Weinstein was indicted for federal and state criminal offenses. The federal charges were subsequently dismissed. Weinstein was tried and acquitted on the state charges.

On June 26, 1980, plaintiff discussed his upcoming testimony in the then pending state criminal action against Weinstein with Assistant U.S. Attorneys Jeffrey Niesen and Jay Weill. Plaintiff maintained the position that he had not improperly disclosed any information obtained from Weinstein. Weill questioned plaintiff's account by asking him, "C'mon Caramucci, we know how you operate, what really happened?"

Shortly before plaintiff appeared in the state criminal proceedings against Weinstein, he was told by Niesen that plaintiff was "on his own" if Weinstein waived his rights of confidentiality and testified outside the subject matter of a summons plaintiff had earlier supported in a related action to obtain documents about Weinstein from third parties. Weinstein was acquitted, and thereafter filed a civil complaint in federal district court against several IRS employees (including plaintiff), the IRS itself, the Drug Enforcement Agency (DEA) and a DEA employee. He asserted a number of claims, all stemming from the post-arrest interview and the subsequent prosecution. Weinstein specifically contended that the plaintiff and two other IRS agents who participated in the interview disclosed confidential information in violation of 26 U.S.C. § 6103 (1982).

On July 16, 1980, the IRS's Assistant Regional Counsel notified plaintiff in writing that he might be eligible for represen-

tation by a Government attorney. Representation might subsequently be denied if it was determined plaintiff was not acting within the scope of his duties. It closed by asking plaintiff to sign the letter if he wished Government counsel to represent him. Plaintiff signed the form on July 24.

At some point in July plaintiff also employed attorney David Bancroft, who had formerly been Chief of the Criminal Division of the U.S. Attorney's Office, apparently in San Francisco. Bancroft represented plaintiff throughout the subsequent litigation and it is his billings to plaintiff in a total amount of $20,525.51 which are at issue.

On July 28, 1980, Bancroft wrote Niesen asking for the cooperation of the other defendants. In a letter dated August 4, 1980, Assistant Regional Counsel for the IRS Robert Wilson wrote plaintiff that he understood plaintiff would also be represented by a private attorney who would serve as lead counsel in his defense, and that the IRS would cooperate to the extent appropriate in defending against Weinstein's complaint. The letter went on to state,

> You are advised that there is no authority for the United States Government to reimburse you for any legal expenses, including private attorney fees, which you may incur in the defense of the [Weinstein] litigation.

On August 21, Niesen wrote Bancroft that with respect to Caramucci's defense,

> This office views our dual representation of Mr. Caramucci as in the nature of co-counsel. By that I mean we will in concert with your office make legal decisions regarding strategy, timing, approach, etc. We will sign the pleadings as co-counsel and jointly share in the responsibility for the overall defense.
>
> However, it is foreseeable, although totally unexpected, that this office may perceive a conflict between our offices, either arising from our responsibilities to represent other defendants or in the manner of the representation tendered. If this arises, and if the conflict cannot be resolved, this office, after conferral

with Mr. Caramucci will withdraw as counsel.

It is obvious from the submissions that Bancroft took a very substantial if not lead role in subsequently defending plaintiff in the civil action. A separate answer was filed for plaintiff, as well as the other defendants. In plaintiff's answer, signed by both Niesen and Bancroft, he specifically denies that IRS agents disclosed the contents of Weinstein's statement. On October 10, 1980, the federal defendants jointly moved to dismiss Weinstein's complaint on a number of legal grounds, most of which were rejected in the district court's order of February 11, 1981.

The defendants in the Weinstein action later filed a motion for summary judgment, based insofar as is relevant here, on a claim of collateral estoppel. They asserted that Weinstein had unsuccessfully intervened in a related federal action in which the IRS was seeking certain Weinstein-related documents from third-party record holders. The district court thereafter dismissed the action against Caramucci, finding that Weinstein was estopped to assert that plaintiff had improperly disclosed information obtained through the interview.

On April 7, 1983, plaintiff wrote the IRS District Director, making a claim for his legal costs in defending against the Weinstein action. In it, plaintiff referred to the Weill and Niesen statements as creating a conflict of interest, asserted that Bancroft had disagreements with the U.S. Attorney's office regarding case handling, and claimed that the Government's legal work was inadequate. The request was later supported by a May 4, 1983 letter signed by Weill and John Barg, Chief of the U.S. Attorney's Civil Division for the Northern District of California, recommending that the claim be paid. The letter recites:

> In this case, a potential conflict has existed between Mr. Caramucci and Drug Enforcement Administration defendants to whom he allegedly disclosed taxpayer information in violation of 26 U.S.C. § 6103. Mr. Caramucci was naturally concerned that a vigorous defense of the DEA agents might work to his

detriment. Viewed in conjunction with the *personal* exposure of federal officials to money damages in these cases, and the fact that a San Francisco jury would be responsible for deciding the liability of federal law enforcement officers, Mr. Caramucci was plainly justified in turning to private counsel.

In our view, the interests of Justice and the interests of the Internal Revenue Service would be best served by reimbursing Mr. Caramucci for his legal expenses. We would be happy to provide any additional information you might need in support of Mr. Caramucci's claim.

The claim for reimbursement was turned down. Plaintiff subsequently filed a complaint on the same basis in the District Court for the Northern District of California. That court transferred the action to this court on June 26, 1986.

## II. *Discussion*

### A. There Was No Implied Contract to Reimburse Legal Costs

Although not clearly articulated in the complaint, plaintiff takes the position in his briefing that he can show that there was an implied contract to reimburse his legal expenses. He further contends that there is presently a factual dispute on this claim which prevents entry of summary judgment. The court disagrees in both respects.

In their Reply Declarations,[1] Weill and Niesen state that there was never any agreement to reimburse plaintiff's legal costs. Although these statements would obviously be vulnerable to a counter assertion that there were other actions of which Weill and Niesen were not aware that would constitute an implied agreement, plaintiff makes no effort to directly contest the statements. Instead he makes the following assertions by brief:

[T]he actions of the U.S. Attorneys in approving counsel, and implicitly approving the eventual reimbursement of Plaintiff's independent counsel legal fees, was acknowledged and impliedly ratified by the Regional Counsel of the Department of the Treasury. See the offer of legal services and acceptance thereof shown in Exhibit C to the Seyferth Affidavit (letter from Robert J. Wilson to Joseph Caramucci with acknowledgement signed by Joseph Caramucci). Subsequent boiler plate letters which contain obvious inaccuracies with respect to the law and facts of the situation do not obviate the implicit ratification of Plaintiff's independent counsel and the U.S. Government's implicit promise to reimburse independent counsel's legal fees.

Plaintiff's Memorandum of January 16, 1987, p. 22.

■■■ An implied in fact contract possesses the same key elements as an express contract: a definite offer, an unconditional acceptance, and consideration. *Baltimore & O.R.R. v. United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *Insurance Co. of North America v. United States*, 11 Cl.Ct. 1, 3 (1986). Here, no serious argument can be made that there is a factual dispute as to whether there was an implied contract. The August 4 letter from Wilson, acknowledged by plaintiff, cannot reasonably be construed as an offer to pay private legal expenses. It is merely a conditional offer of *Government* counsel. Furthermore, defendant's lack of objection to plaintiff's choice of private counsel is completely consistent with the understanding that it was plaintiff who was paying for Bancroft's services. The Weill/Niesen letter of May 4, 1983, moreover, cannot possibly be an offer or an acceptance or be based on adequate consideration. On the face of it, it is merely a recommendation that plaintiff be reimbursed, and in any event comes after Bancroft's services were rendered.

---

1. The Weill and Niesen reply declarations came after defendant's initial submission on the motion, along with a second declaration by Mary Seyferth. Plaintiff was given an opportunity to controvert the declarations but did not submit any additional affidavit declarations or materials. *See Allen v. United States*, 229 Ct.Cl. 515, 517 (1981). The court denies plaintiff's request to strike the declarations.

■ Finally, plaintiff's assertion in his affidavit that he "impliedly understood that such expenses would be reimbursed" also refers only to the Weill/Niesen letter. Without more, there simply is no substance from which to draw a factual dispute.

## B. Defendant Is Not Estopped

■ The Weill/Niesen letter also forms the basis of the plaintiff's argument that Government's conduct should estop it from now refusing to reimburse him. The simple answer to that argument is that the May 4 letter came *after* Bancroft had completed his representation. Plaintiff cannot sustain the necessary assertion of reliance. *See Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 659 (1973). In addition, it would have been unreasonable in any event to rely on a letter *recommending* payment as constituting a decision to pay. If Weill and Niesen felt it was necessary to recommend that the District Director either approve payment, or himself recommend payment, it is obvious their letter cannot constitute a decision to pay.[2]

Finally and most telling, the IRS letter to plaintiff of August 4, 1980 states in no uncertain terms that "there is no authority for the United States Government to reimburse you for any legal expenses." While that statement is not entirely accurate, whether accurate or not it clearly put plaintiff on notice that the defendant was not then planning to pay his private counsel expenses. Plaintiff's characterization of this as "boilerplate" in no way undercuts its relevance.

## C. The Applicable Regulations Do Not Form a Basis For Relief

Whether plaintiff is entitled to reimbursement must turn ultimately on an interpretation of the regulations authorizing such payments under limited circumstances. The Government's initial offer to represent plaintiff was based on 28 C.F.R.

§ 50.15(a) (1982) which provides in relevant part:

(a) Under the procedures set forth below, a federal employee ... may be provided representation in civil and Congressional proceedings and in state criminal proceedings in which he is sued, subpoenaed, or charged in his individual capacity, ... when the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment and providing representation would otherwise be in the interest of the United States.

The Government was apparently satisfied that these requirements were met and plaintiff accepted the offer of representation.

Order 1240.2C of the Service's Chief Counsel, dated January 3, 1980, further gives instructions on how representation is handled. For one thing, it makes clear that an employee can seek private counsel even though representation by Government counsel is requested. That of course is how plaintiff here proceeded.

The regulations go on to provide that under certain circumstances, a federal employee who otherwise meets the requirements of § 50.15 may be entitled to private counsel paid for by the Government. Of the three possible justifications for reimbursement, only the one set out at § 50.15(a)(9) applies here:

If conflicts exist between the legal and factual positions of various employees in the same case which make it inappropriate for a single attorney to represent them all, the employees may be separated into as many compatible groups as is necessary to resolve the conflict problem and each group may be provided with separate representation. Circumstances may make it advisable that private representation be provided to all conflicting groups and that direct Justice Department representation be withheld so as not to prejudice particular defendants.

---

2. Although not necessary to the conclusion, the court notes that Weill and Niesen would not, as Assistant U.S. Attorneys in the Northern District of California, be authorized under the only applicable regulations to approve such payment. *See* 28 C.F.R. § 50.15 (1986) (giving approval authority to the particular litigation division with the Department of Justice's Civil Division).

In such situations, the procedures of § 50.16 will apply.

In the case at bar, plaintiff and the other IRS employee defendants had different Government counsel than the DEA and the DEA employee defendant. It is plaintiff's position, however, that this was inadequate and that the presence of actual or potential conflict warrants the full remedy provided by subsection (a)(9), namely reimbursement of his private counsel.

Where private counsel is provided, the regulations require that "the Department must approve in advance any private counsel to be retained." 28 C.F.R. § 51.16(c)(1). Although plaintiff does not contend that he specifically sought such approval, he asserts that Government conduct constituted acquiescence in his choice. Although one of defendant's contentions on summary judgment is plaintiff's failure to obtain advance approval of Bancroft, it does not contend that plaintiff's choice would have been questioned. It would be hard pressed to do so considering the amount and apparent quality of his work, and defendant's reliance on it. It is not necessary to address this issue, however, because plaintiff does not meet the threshold requirements of entitlement set out in § 50.15.

■ Subsection (a)(9), set out above, only requires consideration of exclusively private counsel "[i]f conflict exists between the legal and factual positions" of the employee defendants. From plaintiff's argument, it might appear that this provision is actuated by *potential* conflict in positions taken. It is clear, however, that the possibility of conflict is not enough. The use of the term "conflict exists" simply does not leave room for potentialities. The conflict must be existent, and it must rise to the level of a present conflict in factual or legal positions actually taken. It would not be enough to point to conflict of a personal nature, for example, which did not affect a position taken in the litigation.

■ Plaintiff's argument that potential conflict warrants reimbursement of private counsel is based in part on paragraph 6(b)(3) of Chief Counsel's Order 1240.2C:

(3) When representation is afforded an employee by Government counsel, it is emphasized that the Government is also the client of the attorney who is providing representation to the employee sued individually. It has been determined that the Government has an interest in the outcome of the suit; and therefore, the Government attorney is assigned to the case to protect that interest. In so doing the Government attorney is confronted with the fact that he/she acquires the individual employee as an additional client whose interest must also be protected. Thus, the Government attorney has two clients: the employee defendant and the United States Government. Obviously, this dual interest places the attorney in a potential conflict of interest situation. The caveats and exceptions set forth in this Order (for example, see (9) below) are designed to protect the attorney from being involved in an actual conflict of interest; and at the same time, they are designed to afford the employee as much individual protection as possible. As a general rule, the interest of the United States and the employee coincide. However, whenever the interest of the employee diverges from that of the United States, as when the employee confides information to the attorney which tends to show the employee has committed a crime, representation of the employee by Government counsel will cease.

. . . .

This language, however, is no more than a candid admission of the realities of having two clients in the same action. The *potential* always exists that the interests of the Government will be at odds with those of the employee. This paragraph does not purport to extend the coverage of § 50.-15(a), however. If it did, then the joint operation of the two provisions would mean that private counsel would always be required and reimbursed, since the potential for conflict is always present. That result would be absurd and in any event is not called for by either provision.

■ Plaintiff's statement of the controlling issue, consequently, is mistaken: "The issue ... is therefore limited to whether there [are] sufficient allegations of a *potential* conflict of interest." Plaintiff's Memorandum of January 16, 1987, p. 9 (emphasis added). The real issue is whether there are viable assertions of actual conflict in the defendants' positions. Plaintiff's brief contains myriad generalized assertions that potential or actual conflict existed in the conduct of the litigation, but very few particulars. An examination shows that they do not prevent entry of summary judgment.

Plaintiff's first particular is that plaintiff's counsel and the U.S. Attorney's Office foresaw very different litigation strategies. The court observes initially that differences in litigation strategies are not the risk referred to in § 50.15. Differences in strategy are a far cry from conflicts in positions taken. In any event, the documentary support for the supposed differences is chimerical. The Niesen letter of August 21, 1980, at the outset of the civil litigation, merely states that "it is foreseeable, although totally unexpected, that this office may perceive a conflict between our offices.... If this arises, and the conflict cannot be resolved, this office, after conferral with Mr. Caramucci will withdraw as counsel." Obviously Niesen did not mean that as a statement of present conflict—his office continued to represent plaintiff.

■ Plaintiff also points to a letter he received from Bancroft in August 1980 in which his lawyer justifies a larger-than-normal monthly bill. Bancroft writes that the bill

was unusually high for several reasons, which should not repeat themselves: First, we had to fully co-participate in the strategy sessions to date to keep everyone (the government attorneys especially) on the same course, i.e., to prevent the U.S. Attorney's office from moving to dismiss some defendants, but not you—leaving us somewhat alone. This has now been achieved and I do not expect any further such sessions.... And third, the representation question

had to be settled so that you genuinely had government representation and its resources to fully pay for what promises to be very substantial deposition expenses, witness fees and document reproduction costs.

I have a good working relation with AUSA John Barg—who we are manoeuvering to take over as chief government counsel. He is sound and tough. We can look forward to private counsel taking a monitoring roll.

... I've got Barg drafting an answer and a strategy/schedule for a discovery offensive—prior to counsels' meeting on September 11 for filing September 15.

The plain import of this message is that, under Bancroft's watchful eye, things were proceeding smoothly and in tandem with Government counsel, including Barg, counsel for the DEA defendants. Even the possibility (in any event forestalled) that some other defendants than plaintiff would be dismissed does not mean there was an actual conflict. For example, Bancroft's letter of February 18, 1981, upon which plaintiff also relies, clearly contemplates that defenses available to plaintiff might not be available to others.

Plaintiff further points to the fact that in preparing him for testimony in the criminal proceeding, Weill strongly implied that plaintiff actually passed on information to the DEA. Whether Weill's comment reflected genuine skepticism or merely vigorous preparation of a witness, as he contends, makes no difference. Even if Weill did not believe plaintiff, his official actions in the litigation and all the formal positions taken by Government counsel for plaintiff or for other defendants were absolutely consistent with those of plaintiff. At no point did the Government or another defendant jeopardize plaintiff's position.

Plaintiff also points to Niesen's statement prior to Weinstein's criminal trial that *if* Weinstein in testimony waived his confidentiality protections and testified beyond the scope of a summons signed by plaintiff, plaintiff was "on his own." This occurred on July 19, 1980. Plaintiff does not allege that Weinstein did in fact waive his rights.

Apparently he did not, for Government counsel continued to represent him and plaintiff was never "on his own."

As discussed above, plaintiff's reliance on the Weill/Niesen letter supporting his request for reimbursement does not reflect a conflict within the meaning of § 50.-15(a)(9). While it points to legitimate concerns about potential conflict, and reflects their view of the quality of Bancroft's work, it would be anomalous if it reflected the presence of *actual* conflict. The two Government attorneys had represented Caramucci or his codefendants simultaneously with Government interests for two years without withdrawing as counsel for any individual defendants.

### III. *Conclusion*

In sum, while the theoretical possibility that a person in plaintiff's position might face criminal prosecution for violation of disclosure prohibitions inhere in circumstances such as these, the mere possibility of such a conflict is not enough to invoke the coverage of § 50.15. The Attorney General has set certain conditions upon which the Government will pay private counsel for representation of an individual. If those limited conditions are not met, this court does not have authority to order payment regardless of how unmeritorious Weinstein's complaint may have been, or how helpful Bancroft was to the litigation.

Defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint with prejudice. Each side to bear its own costs.

It is SO ORDERED.

