**John B. MCNABB, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 00–143C.

United States Court of Federal Claims.

Dec. 10, 2002.

**760**

Steven V. Richert, Pocatello, Idaho, for the plaintiffs.

Kyle Chadwick, Commercial Litigation Branch, Civil Division, Department of Justice, James M. Kinsella, Deputy Director and David M. Cohen, Director, Commercial Litigation Branch, for the defendant. Marlene Zichlinsky, Department of the Interior, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiffs are John B. McNabb, John C. McNabb, Karen McNabb, William B. McNabb, Lisa McNabb, Michael R. McNabb, Beverly McNabb and the McNabb Farms Partnership (collectively, "McNabb"). Defendant is the United States, specifically the Bureau of Indian Affairs (BIA) of the United States Department of the Interior. According to the joint stipulation of facts entered into by the parties, between August, 1982 and September, 1995, plaintiffs entered into approximately twenty-two leases on farm land located on the Fort Hall Indian Reservation, in Bannock County, Idaho, with members of the Shoshone–Bannock Tribes. The leases were cash leases, requiring McNabb to make annual payments to the Native American allottees for use of their land.

On March 9, 1987, McNabb and BIA representative Duane F. Thompson, the Superintendent of the Fort Hall Agency, signed a document titled "Farm Lease," under which approximately 12,000 acres of land within the Fort Hall Indian Reservation were leased to plaintiffs for five years, beginning March 1, 1987, and renewable under the same terms for another five years, at plaintiffs' option. This March 9, 1987 agreement was characterized not as a cash lease, but as a "share-cropping lease." Under the terms of this Farm Lease, BIA was to assume responsibility for 80 percent of the costs incurred growing crops and was to receive 80 percent of the gross proceeds. McNabb would retain responsibility for 20 percent of the costs and receive 20 percent of the profits. In addition, the parties have stipulated that, from 1987 through 1996, plaintiffs made annual payments of fifteen dollars per acre to Native American allottees, through the BIA.

Plaintiffs and the BIA enrolled the leased property in farm subsidy programs with the Farm Service Agency (FSA) of the United States Department of Agriculture. After receiving the allottees' share of the crop subsidies, the BIA would endorse the crop subsidy payments to plaintiffs. Plaintiffs' amended complaint states that subsidies exceeded $1,000,000.00 for the relevant years and were applied toward the costs of production and ultimately toward any gross profit or loss derived from farming the land.

Prior to the end of the five year base term of the March 9, 1987 Farm Lease, on November 19, 1990, McNabb and Thompson signed another five-year Farm Lease, to begin on January 1, 1991, which included approximately 17,000 acres of Fort Hall Reservation land. This November 19, 1990 Farm Lease was renewable for five years under the same terms, at the option of the plaintiffs. The amended complaint states that in August, 1996, the BIA was informed of McNabb's intention to renew the November 19, 1990 Farm Lease for approximately 17,000 acres of land. In an August 14, 1996 letter to the Power County, Idaho FSA Office, the Superintendent of the BIA Fort Hall Agency, Anna

Townsend, confirmed that "[w]e are now renewing their [McNabb's] option for crop years 1996 and 1997 ...." Ms. Townsend's August 14, 1996 letter was in response to an inquiry into plaintiffs' leases which had been initiated by the Power County, Idaho FSA in July, 1996. Ms. Townsend's letter to the FSA also characterized McNabb's November 19, 1990 Farm Lease as a "valid crop share lease," and suggested that there had been some confusion within the BIA Fort Hall Agency about the nature of the leases, but that, after researching the situation, including contacting the BIA Portland Area office and the BIA's Regional Solicitor, the BIA Fort Hall Agency office had authorized the lease arrangements with McNabb "to continue as in the past."

On August 20, 1996, Delbert Farmer, the Chairman of the Fort Hall Business Council of the Shoshone–Bannock Tribes, submitted a letter to the Portland Area Director of the BIA in response to Ms. Townsend's letter. Mr. Farmer's letter stated that the Shoshone–Bannock Tribes objected to the renewal of the November 19, 1990 lease agreement with plaintiffs, because "[t]he Tribe, in 1990, did not see the agreement and did not approve the lease." The Power County FSA subsequently determined that the BIA was not sharing in the risk of the crop, and that, therefore, the lease was determined to be a cash lease. As a result, the FSA denied the plaintiffs' application for crop subsidy payments for lease renewal year 1996.

McNabb sought review of this FSA county-level decision to deny crop subsidy payments for 1996 by the Idaho FSA State Committee, which also determined that McNabb was operating pursuant to a cash lease. The FSA State Committee found that McNabb Farms Partnership was ineligible to receive any program payments, not only for 1996, but also for lease renewal year 1997. The FSA State Committee decision concluded that:

> In the opinion of the State Committee, FSA was never informed by McNabb Farms Partnership or the BIA of the cash advance being paid by McNabb Farms Partnership to BIA. By not providing this information it has the effect of evading payment limitation. According to [7 C.F.R.] § 1497.6 this shall be interpreted as Scheme or Device and the persons involved shall be ineligible for payments with respect to the year for which such scheme or device was adopted [1996] and the succeeding year [1997].

Seeking redress of this decision, McNabb originally filed suit in the United States District Court for the District of Idaho. By stipulation, the parties before the District Court agreed that the case should be transferred to the United States Court of Federal Claims. After the District Court transferred the case to the Court of Federal Claims, plaintiffs filed an amended complaint.

Count one of the plaintiffs' amended complaint alleges that the BIA's refusal "to acknowledge the existence of the 1987 and 1991 share crop leases" constitutes a "taking of private property and interference with contractual relationships ...." Defendant denies that a taking occurred, and moves for summary judgment on count one. Counts two through five also are based on the claim that the BIA refuses to acknowledge the crop share leases. Count two, for example, asserts a breach of contract claim in that the Fort Hall Agency of the BIA leased land to McNabb, then refused to acknowledge the validity of the leases. Count three alleges that the BIA's refusal to acknowledge the crop share leases was arbitrary and capricious. Count four alleges that the BIA does not have the authority to refuse to acknowledge crop share leases executed by a former Superintendent of the BIA's Fort Hall Agency. Count five alleges that the BIA should be equitably estopped from denying the existence and validity of the crop share leases. Defendant moves to dismiss counts two through five of the amended complaint for lack of jurisdiction over the subject matter. Defendant also moves to dismiss counts two through five for failure to state a claim upon which relief can be granted, which the court treats as a motion for summary judgment because the court has been presented with, and has relied on, matters outside the pleadings. *See* Rule 12(b) of the Rules of the United States Court of Federal Claims (RCFC).

## DISCUSSION

*Motion to Dismiss*

Defendant has filed a motion to dismiss counts two through five of the amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(1) and 12(b)(6). Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir. 1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir. 1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction), *aff'd*, 292 F.3d 1383 (Fed.Cir.2002); *Schweiger Constr. Co. v. United States*, 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir.1988); *Martinez v. United States*, 48 Fed.Cl. 851, 857 (2001), *aff'd in part*, 281 F.3d 1376 (Fed.Cir.), *reh'g denied* (2002); *Bowen v. United States*, 49 Fed.Cl. at 675; *Vanalco, Inc. v. United States*, 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States*, 32 Fed. Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Consolidated Edison Co. v. O'Leary*, 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States*, 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied*, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed. Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.' "); *RCS Enters., Inc. v. United States*, 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes*,

416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir. 1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir. 2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir. 1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Vanalco v. United States,* 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct.

2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001), *cert. granted*, 535 U.S. 1016, 122 S.Ct. 1604, 152 L.Ed.2d 619 (2002); *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000); *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1555–56 (Fed.Cir. 1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" *White Mountain Apache Tribe v. United States*, 249 F.3d at 1372 (quoting *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States*, 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied, en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. at 607, 372 F.2d at 1009.

Because the court has been presented with matters outside the pleadings by both parties, which the court has relied on, defendant's motion to dismiss breach of contract counts two through five for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6), is treated as a motion for summary judgment pursuant to RCFC 56.[1] *See* RCFC 12(b); *Cienega Gar-*

*dens v. United States*, 194 F.3d 1231, 1236, 1246 (Fed.Cir.1998) ("Considering matters outside the pleadings, the court treated the government's motion to dismiss as a motion for summary judgment, in accordance with Rule 12(b) of the Court of Federal Claims ('RCFC').... The court should have granted summary judgment in favor of the government on the breach of contract claims."), *cert. denied sub nom. Sherman Park Apartments v. United States*, 528 U.S. 820, 120 S.Ct. 62, 145 L.Ed.2d 54 (1999); *Warr v. United States*, 46 Fed.Cl. 343, 350 (2000) (the government's motion to dismiss for failure to state a claim upon which relief can be granted was treated as a motion for summary judgment because the court was presented with and did not exclude matters outside the pleadings). Therefore, count one (taking claim) will be reviewed for summary judgment pursuant to RCFC 56, and counts two through five (breach of contract) also will be reviewed for summary judgment.

*Summary Judgment*

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir. 2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case

---

1. Counts two through five also will be reviewed under defendant's motion to dismiss for lack of jurisdiction over the subject matter, pursuant to RCFC 12(b)(1).

under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* No. 01–5143, 2002 WL 31724971 (Fed.Cir. Dec.3, 2002); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more

evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997);

*Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D. H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

*Jurisdiction*

Based on the parties' stipulation, this case was transferred from the United States District Court for the District of Idaho. *See McNabb v. Oliver,* No. 99–124–E–BLW, Order Transferring Case to Court of Federal Claims, at 1 (D.Idaho Jan. 10, 2000). The plaintiffs' amended complaint in this court cites as its jurisdictional basis the same jurisdictional basis cited by plaintiffs in the earlier federal district court action. Plaintiffs cite, for example, 28 U.S.C. § 1331 (federal question jurisdiction in federal district court), 28 U.S.C. § 1361 (providing for original jurisdiction in federal district court) and 28 U.S.C. §§ 2201, 2202 (providing for declaratory judgments in federal district court). These statutes do not provide jurisdiction in the Court of Federal Claims. *See James v. Caldera,* 159 F.3d 573, 579 (Fed.Cir.1998), *reh'g denied* (1999).

■ As another jurisdictional basis for their action, plaintiffs' amended complaint cites to sections of the Administrative Procedure Act, 5 U.S.C. §§ 704, 705 and 706, which provide for the review of final agency action in federal district court. Count three of the plaintiffs' amended complaint alleges that the BIA's refusal to acknowledge the crop share Farm Leases was arbitrary and capricious. The arbitrary or capricious review of agency action based on 5 U.S.C.

§ 706 is found in the Tucker Act, but only with respect to bid protests. See 28 U.S.C. § 1491(b)(4). BIA regulations do cite the Administrative Procedure Act as a remedy for lease disputes. *See* 25 C.F.R. §§ 2.3(b), 162.14 (1987) (providing that final agency action is subject to judicial review under 5 U.S.C. § 704); *see also* 25 C.F.R. §§ 2.6(a), 162.252(c)(3) (2001). However, review of final agency decisions under the APA is not within the jurisdiction of this court.

In general, APA reviews are conducted in federal district court rather than the Court of Federal Claims, since the APA itself addresses "relief other than money damages." 5 U.S.C. § 702 (1994), and money damages are the cornerstone of this court's Tucker Act jurisdiction. The United States Court of Appeals for the Federal Circuit noted in *Consolidated Edison Company of New York, Inc. v. United States* that:

> The Supreme Court has explained that a litigant may invoke the APA as a waiver of sovereign immunity, thereby invoking district court jurisdiction, if the litigant can satisfy both 5 U.S.C. § 702 (by requesting "relief other than money damages") and 5 U.S.C. § 704 (1994) (no "adequate remedy" is available elsewhere, such as the Court of Federal Claims). *Bowen v. Massachusetts,* 487 U.S. [879, 892–93, 904–05, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)].

*Consol. Edison Co. of New York v. United States,* 247 F.3d 1378, 1382 (Fed.Cir.), *cert. denied,* 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001); *see also Vereda, Ltda. v. United States,* 271 F.3d 1367, 1375 n. 8 (Fed. Cir.2001) ("[T]he Court of Federal Claims lacked the general federal question jurisdiction of the district courts, which would have allowed it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706."); *Cermak v. Babbitt,* 234 F.3d 1356, 1364 (Fed.Cir. 2000) ("[T]he Cermaks could have sought review of the IBIA [Interior Board of Indian Appeals] decision by bringing an APA action in the district court.... However, because the Cermaks did not pursue a claim under

the APA, the district court lacks jurisdiction over their case."), *cert. denied,* 532 U.S. 1021, 121 S.Ct. 1961, 149 L.Ed.2d 756 (2001); *Smith v. Babbitt,* 96 F.Supp.2d 907, 908–10 (D.Minn.2000) (Native American claimants challenged the final administrative decision of the Interior Board of Indian Appeals in federal district court under the APA and the federal question statute, 28 U.S.C. § 1331).

Plaintiffs do not cite to the Tucker Act as a basis for jurisdiction in this court. Plaintiffs' amended complaint filed in this court, however, does appear to be bringing this action pursuant to contract claim, specifically, the March 9, 1987 and November 19, 1990 Farm Leases, and the 1996–1997 renewal of the November 19, 1990 Farm Lease. Plaintiffs' assertion of contract claims suffices as a money mandating basis for jurisdiction in this court.[2] As the United States Court of Appeals for the Federal Circuit stated in *Trauma Service Group v. United States:*

> To show jurisdiction in the Court of Federal Claims, TSG [plaintiff] must show that either an express or implied-in-fact contract underlies its claim. A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction. *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679, 686 (Fed.Cir.1992). TSG's complaint alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim. This allegation suffices to confer subject matter jurisdiction in the Court of Federal Claims. *See Gould [v. United States,* 67 F.3d 925, 929 (Fed.Cir. 1995)]; *see also Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989) ("Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.") (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)).

*Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *see also Warr v. United States,* 46 Fed.Cl. at 350.

---

**2.** Defendant filed a motion to dismiss counts two through five for lack of jurisdiction over the subject matter, pursuant to RCFC 12(b)(1). One of defendant's arguments was based on the alleged absence of a Tucker Act, money-mandating basis for plaintiffs' claims, such as a contract, statute, regulation or constitutional provision that provides for monetary relief.

Plaintiffs also cite the Fifth Amendment of the United States Constitution and characterize count one of the amended complaint as a taking claim, thereby asserting a constitutional provision that provides for monetary relief, and jurisdiction in this court to consider plaintiffs' claim.

*Contracting Authority*

Defendant contends that "[t]he Government can be contractually bound only by agents who possess actual contracting authority" and that "[t]he applicable regulations do not confer any authority upon BIA officials to form Government contracts with respect to allotted Indian lands." Therefore, the government argues there is an absence of privity of contract, which is fatal to plaintiffs' contract claims. In a case in which privity of contract between the claimant and the government was not found, the United States Court of Appeals stated:

> Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1994). We have stated that "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government ...." *Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir. 1990). In other words, there must be privity of contract between the plaintiff and the United States. *See Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract."). The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity. *See National Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 ( Fed.Cir.1997) ....

*Cienega Gardens v. United States*, 194 F.3d at 1239.

■ To recover under a theory of contract, the plaintiff must show that the government agent whose conduct was relied upon had actual authority to bind the government. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997)

(citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991)); *Warr v. United States*, 46 Fed. Cl. at 350.

■ The United States Supreme Court has stated:

> [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (citations omitted); *see also Total Med. Mgmt. Inc. v. United States*, 104 F.3d 1314, 1321 (Fed.Cir.) (the government is not bound by agents who act beyond their authority and contrary to regulation) (citations omitted), *cert. denied*, 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997). The plaintiff bears the burden of proof with respect to the government agent's authority to enter into a contract on behalf of the government. *Trauma Serv. Group v. United States*, 104 F.3d at 1325, 1327; *City of El Centro v. United States*, 922 F.2d at 821; *Warr v. United States*, 46 Fed.Cl. at 350 ("[P]laintiff must also demonstrate that the government representative who entered the agreement had actual authority to bind the government.").

■ The BIA has been assigned responsibilities to act as a manager and protector of Native American affairs. "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior ... have the management of all Indian affairs and of all matters arising out of Indian relations." 25 U.S.C. § 2 (1994).

> Congress has established the Bureau of Indian Affairs within the Department of the Interior, under the direction of the Commissioner of Indian Affairs ... [to] manage all Indian affairs and all matters arising out of Indian relations with a just

regard not merely to the rights and welfare of the public, but also to the rights and welfare of the Indians, and to the duty of care and protection owing to them.

41 Am.Jur.2d Indians § 36 at 515–16 (1995) (footnotes omitted); *see also Brown v. United States*, 86 F.3d 1554, 1562–63 (Fed.Cir. 1996) ("The [BIA] regulations thus make it clear beyond any doubt that the Secretary exercises his or her control over commercial leasing on allotted lands not only for traditional general welfare purposes, as section [25 U.S.C. § ] 415(a) alone would suggest, but also for the purpose of protecting the allottees' financial interests.").

As to the BIA's role of manager and protector of Native American interests, plaintiffs argue that "BIA representatives assumed almost total managerial control over the allotted lands on the Fort Hall Indian Reservation," and that "most, if not all, Indian land owners had no input in the management or care of the allotted lands and relied almost exclusively upon the BIA to lease and manage [the Tribal lands]." This description of the BIA's role, to the extent that it is consistent with the statutory command for the BIA to "have the management of all Indian affairs and of all matters arising out of Indian relations," 25 U.S.C. § 2, however, is distinguishable from the BIA as the party which entered into a contract with the plaintiffs.

The United States Supreme Court decision in *United States v. Algoma Lumber Co.*, 305 U.S. 415, 421, 59 S.Ct. 267, 83 L.Ed. 260 (1939), provides an example of the government's role as a manager and protector of Native American affairs. The *Algoma* case involved a contract providing for the sale of timber on the Klamath Reservation. *Id.* at 417, 59 S.Ct. 267. The contract was entered into between the Superintendent of the Klamath Indian School for and on behalf of the Klamath Indians and the Algoma Lumber Company and was approved by an Assistant Secretary of the Interior. *Id.* at 419, 59 S.Ct. 267. The Algoma Lumber Company bought suit against the Department of the Interior for overpayments made to the Superintendent, claiming that

the manner of sale ... prescribed by the Secretary, that the contracts be executed

by the Superintendent and approved by the Secretary, and that the prices of lumber be fixed by the Indian Commissioner, indicate a purpose to make the United States, acting as guardian or trustee of the Indians through the Secretary and Superintendent, the contracting party.

*United States v. Algoma Lumber Co.*, 305 U.S. at 422, 59 S.Ct. 267. The Supreme Court in *Algoma Lumber* noted that

the government has plenary power to take appropriate measures to safeguard the disposal of property of which the Indians are the substantial owners. Exercise of that power does not necessarily involve the assumption of contractual obligations by the government. Their assumption is not to be presumed in the absence of any action taken by the government or on its behalf indicating such a purpose.

*Id.* at 421, 59 S.Ct. 267. The *Algoma* court concluded, regarding the actions taken by the Superintendent and the Secretary in contracting, that

all that was done by the government officials in supervising the execution of the contracts and their performance was consistent with the exercise of its function as protector of the Indians without the assumption by the United States of any obligation to the purchasers of the timber, and no implied obligation on its part arises from the performance of that function.

*Id.* at 422, 59 S.Ct. 267; *see also Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 895 (10th Cir.1991) ("[T]he United States is not liable to third parties when it contracts with them on behalf of Indian tribes.") (citing *United States v. Algoma Lumber Co.*, 305 U.S. at 423, 59 S.Ct. 267), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992); *Warr v. United States*, 46 Fed.Cl. at 348–49 (relying on the *Algoma Lumber Company* and *Sangre de Cristo Development Company* decisions); *Navajo Nation v. United States*, 46 Fed.Cl. 217, 235 (2000) ("When the Secretary reviews and approves mineral leases as part of his statutory responsibilities, he does not become a lessor or a lessee. We believe this to be the general rule, absent specific statutory authority to the contrary."), *rev'd on other*

**770**

*grounds,* 263 F.3d 1325 (Fed.Cir.2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002).

The government contends that the relevant statutes and regulations do not confer authority on the United States to be in privity of contract with third parties leasing land allotted to Native Americans. Defendant argues that the BIA does not possess the authority to act as a lessor on leases of Tribal lands, but only the authority to approve leases on behalf of Native American allottees. The government notes that, pursuant to 25 U.S.C. § 393 (1988), which is cited by plaintiffs in both count one and count two of the amended complaint, that:

> The restricted allotment of any Indian may be leased for farming and grazing purposes by the allottee or his heirs, subject only to the approval of the superintendent or other officer in charge of the reservation where the land is located, under such rules and regulations as the Secretary of the Interior may prescribe. . . .

25 U.S.C. § 393 (1988). The statute speaks of an approval role for the government, not a role as lessor. Plaintiffs respond that the government can, nevertheless, be in privity of contract with individuals on leases of Tribal lands. Plaintiffs argue that, under 25 U.S.C. § 393, the power of individual Native Americans to lease is subject to the approval of Bureau of Indian Affairs officials, but that the language of section 393 does not preclude the United States from entering into a contract dealing with allotted land. Plaintiffs, however, have the burden to demonstrate privity with the BIA in the contract at issue, and the plain language of section 393 does not provide that authority. The statute, section 393, speaks of the ability of any allotment of a Native American to be leased for

farming and grazing, subject to the "approval" of the appropriate Interior Department official.

Similarly, 25 U.S.C. § 415 provides that, "[a]ny restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes . . . ." 25 U.S.C. § 415(a) (1988); *see Brown v. United States,* 86 F.3d at 1561 (Native American lessors grant leases approved by the Secretary of the Interior, citing 25 U.S.C. § 415(a) and *Sangre de Cristo Dev. Co. v. United States,* 932 F.2d at 894). As the United States Court of Appeals for the Tenth Circuit stated in *Sangre de Cristo Development Co. v. United States,* however:

> Nowhere in § 415 does Congress indicate that the United States is to act as a party to a lease contract between an Indian tribe and a lessee. Section 415 is no different than many other federal statutes that require federal approval of private agreements. We reject the argument that such statutes render the United States a party to agreements reached between private contracting parties merely because its approval is required before the agreements become effective.

*Sangre de Cristo Dev. Co. v. United States,* 932 F.2d at 895; *see also Brown v. United States,* 86 F.3d at 1563.

Bureau of Indian Affairs regulations also provide that leases will be approved by the Secretary of the Interior or authorized representatives in certain specified circumstances.[3] BIA regulations require that leases be on the lease forms approved by the Secretary, subject to the approval of the Secretary. 25 C.F.R. § 162.5(a) (1987).[4] *See*

---

3. In addition to approving leases, the Secretary may "grant" leases "on individually owned land on behalf of" Native Americans in situations specifically prescribed in the regulations, such as when the landowners are orphans or non compos mentis, where there are undetermined heirs or adults whose whereabouts are unknown, and when the Secretary is given written authority to execute leases on behalf of an adult Native American landowner. *See* 25 C.F.R. § 162.2 (1987). Plaintiffs have not demonstrated that the March 9, 1987 or November 19, 1990 Farm Leases were

granted for any of these reasons, or that even granting a lease on behalf of individual Native American landowners places the BIA in the role of a lessor. The BIA in circumstances pursuant to 25 C.F.R. § 162.2 would be acting on behalf of the allottee, who would be the lessor.

4. The regulatory requirement for a standard BIA form for leases existed during the time period of the March 9, 1987 and November 19, 1990 Farm Leases at issue, was maintained by the BIA through its regulations for the year 2000, 25

*Brown v. United States,* 86 F.3d at 1562 (Native American leases shall be in the form prescribed by the Secretary of the Interior, citing 25 C.F.R. § 162.5(a)). The Department of the Interior, Bureau of Indian Affairs Lease form is reflected in the cash leases executed by plaintiffs between 1982 and 1995. The BIA standard form provided for leases "by and between the Indian or Indians named below (the Secretary of the Interior acting for and on behalf of Indians)," and a lessee, such as McNabb. Defendant acknowledges that the March 9, 1990 and November 19, 1990 Farm Leases at issue were not on the BIA's standard lease forms. The 1987 Farm Leases began with the following language: "Agreement between JOHN B. McNABB, doing business as McNabb Farms (hereinafter 'McNabb Farms'), and the BUREAU OF INDIAN AFFAIRS (hereinafter 'BIA')." The 1990 Farm Lease began: "Agreement between MCNABB FARMS PARTNERSHIP, (hereinafter 'McNabb Farms'), and the BUREAU OF INDIAN AFFAIRS (hereinafter 'BIA')."

According to the defendant, however:

The McNabbs may argue that the "share crop leases" at exhibits B and C of the amended complaint constituted agreements directly between the McNabbs and the BIA and, therefore, show the required privity of contract. Although that argument would be consistent with the language of the share crop leases, it should fail. The Government can be contractually bound only by agents who possess actual contracting authority.

In attempting to identify the requisite authority, plaintiffs argue that the BIA regulations at 25 C.F.R § 162.14 provide the United States with the "authority to sue, negotiate and determine an amount of damages" resulting from a breach of the lease. The BIA regulations at 25 C.F.R. § 162.14 (1987, 1991) state that, "[w]here breach of contract can be satisfied by the payment of damages, the Secretary may approve the

damage settlement between the parties to the lease, or where the Secretary has granted the lease, he may accept the damage settlement." Plaintiffs seem to be arguing that, because the Secretary of the Interior or authorized representatives can "approve" a damage settlement, the government is necessarily a party to the lease. Under the plain language of 25 C.F.R. § 162.14, however, the only grant of authority is the Secretary's right to approve the settlements "between the parties to the lease," which is analogous to the right of approving the leases themselves between the parties to the lease, the Native American lessors and their lessees. Section 162.14 does not provide the authority for the BIA to be a lessor of tribal lands.

The BIA regulations at 25 C.F.R. § 162.14, in fact, provide support for the defendant's contention, that the BIA is not authorized to be a lessor of Tribal lands. Section 162.14 is titled "Violation of Lease," and informs about appeal procedures described at 25 C.F.R. Part 2 (1987):

This part [25 C.F.R. Part 2] provides appeals procedures for requesting correction of actions or decisions by officials of the Bureau of Indian Affairs where the action or decision is protested as a violation of a right or privilege of the appellant.

25 C.F.R. § 2.2 (1987).

The regulation on appeals continues:

(a) Except as otherwise provided by law or regulation, any interested party adversely affected by a decision of an official under the supervision of an Area Director of the Bureau of Indian Affairs not approved by the Secretary [of the Interior] before the decision was made shall have a right to appeal. . . .

\*      \*      \*      \*      \*      \*

(b) . . . In order to insure the exhaustion of administrative remedies before resort to court action, no decision which at

C.F.R. § 162.5(a) (1987, 2000) (requiring standard form leases) and then was changed in the year 2001 regulations. The BIA's 2001 regulations provide that: "Based on the need for flexibility in advertising, negotiating and drafting of appropriate lease terms and conditions, there is

no standard agricultural lease form that must be used." 25 C.F.R. § 162.218 (2001). However, even in leases drafted pursuant to year 2001 regulations, the BIA regulations prescribe mandatory provisions for inclusion. *See* 25 C.F.R. §§ 162.219, 162.220 (2001).

the time of its rendition is subject to appeal to a superior authority in the Department [of the Interior] shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless when an appeal is filed, the officer to whom the appeal is made shall rule that the decision appealed from shall be made immediately effective.

25 C.F.R. § 2.3(a), (b) (1987). The BIA regulations at 25 C.F.R. Part 2 quoted above indicate that final agency action is subject to judicial review under 5 U.S.C. § 704, the Administrative Procedure Act.[5] *See* 25 C.F.R. § 2.3(b) (1987).[6] Significantly, there is no mention in the BIA regulations of submitting these 25 C.F.R. § 162.14 leasing issues to a Department of the Interior contracting officer for a final decision, 41 U.S.C. § 605 (1994), or appealing a contracting officer's final decision to either an agency board of contract appeals, 41 U.S.C. § 606 (1994) or to the Court of Federal Claims, 41 U.S.C. § 609 (1994). If the BIA regulations intended the BIA to be a party to a lease, the Contract Disputes Act would be implicated for lease disputes. Instead, lease disputes are treated as requests for correction of actions or decisions by BIA officials by persons who may be adversely affected by the decisions. *See* 25 C.F.R. § 2.2 (1987); 25 C.F.R. § 2.3 (2001). After agency appeals have been exhausted and a final BIA decision is issued, judicial review is not to this court, but to federal district courts for an APA review. *See* 25 C.F.R. § 2.3(b) (1987), 25 C.F.R. § 2.6(a) (2001); *Vereda, Ltda. v. United States*, 271 F.3d at 1375 n. 8; *Consol. Edison Co. of New York v. United States*, 247 F.3d at 1382. BIA regulations provide authority for the BIA to act as an approval official rather than as a lessor of Tribal lands, with any redress

of final agency decisions in federal district court under APA rules.

Plaintiffs also cite one of the provisions in the BIA's standard lease form, and argue that it creates privity of contract between the BIA and the lessees. The BIA standard lease form contains the following provision:

13. UPON WHOM BINDING.—It is understood and agreed that the covenants and agreements hereinbefore mentioned shall extend to and be binding upon the heirs, assigns, executors, and administrators of the parties to this lease. While the leased premises are in trust or restricted status, all the lessee's obligations under this lease, and the obligations of its sureties, are to the United States as well as the owner of the land.

This provision is one required by BIA regulations, both regulations in existence during the period at issue in this case, as well as under the BIA's revised, current regulations. *See, e.g.*, 25 C.F.R. § 162.5(g)(1) (1987); 25 C.F.R. § 162.219(a) (2001). Plaintiffs argue that since this lease provision grants the United States the power to enforce the lease, privity of contract must follow. According to plaintiffs, if the United States is able to enforce the lease against third parties, then the lease must necessarily be enforceable against the United States. Plaintiff contends that, "[a]s one not a part[y] to the contract, the United States would have no ability to enforce the underlying obligations of McNabb." As noted above, however, BIA regulations provide that lease violations are redressed pursuant to 25 C.F.R. Part 2 administratively, within the BIA, with final BIA agency action subject to judicial review in federal district court under the APA. 25 C.F.R. §§ 2.3(b), 162.14 (1987); 25 C.F.R.

---

5. The statute provides:

   Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsidera-

tion, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.
5 U.S.C. § 704 (1994).

6. The 2001 BIA regulations are unchanged with regard to appeal rights within the BIA and judicial review under the APA in federal district court for those adversely affected by the decisions of BIA officials. *See* 25 C.F.R. §§ 2.6(a), 162.252(c)(3) (2001).

§§ 2.6(a), 162.252(c)(3) (2001). In sum, the statutes and regulations cited by plaintiffs do not authorize the BIA to become a party to Tribal contracts, but only provide for the BIA to be an approval authority and guardian of Native American interests, consistent with 25 U.S.C. § 2, with agency administrative appeals and judicial review of final agency decisions under the APA.

The parties have stipulated that during a November, 1996 hearing before the FSA, Duane Thompson, who signed the March 9, 1987 and November 19, 1990 Farm Leases, testified that, "we thought we were doing what was best for the [T]ribe," and that he believed, as the Superintendent of the BIA Fort Hall Agency, he had the "kind of authority to do what [he] needed to do for the best interest of the [T]ribal members here." Mr. Thompson's statement does not assert that the BIA was a lessor on the March 9, 1987 and November 19, 1990 Farm Leases, and, in fact, is consistent with a BIA role of guardian of Native American interests.

Moreover, government officials do not define their own authority. The United States Supreme Court, in *Federal Crop Insurance Corporation v. Merrill,* stated that it was immaterial if "the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. 1; *see also Doe v. United States,* 100 F.3d 1576, 1584 (Fed. Cir.1996) ("Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations."), *reh'g denied, en banc suggestion declined* (1997); *CACI, Inc. v. Stone,* 990 F.2d 1233, 1236 (Fed.Cir.1993). In the instant case, plaintiffs have not carried their burden of identifying authority for the BIA to enter into leases of Tribal lands in the capacity of a lessor, as opposed to in the role of an approving official or guardian, acting on behalf of Native American lessors.

Defendant moves to dismiss counts two through four of the amended complaint, which are based on the March 9, 1987 and November 19, 1990 Farm Leases, and a renewal of the November 19, 1990 Farm Lease for the years 1996–1997, for failure to state a claim upon which relief can be granted. Because the court has been presented with matters outside the pleadings by both parties, relied upon by the court in reaching its decision, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is treated as a motion for summary judgment pursuant to RCFC 56. *See* RCFC 12(b). Defendant is entitled to summary judgment on counts two through four, since plaintiffs have failed to demonstrate privity of contract between the parties. In a procedurally similar case, the United States Court of Appeals for the Federal Circuit concluded that summary judgment was warranted in a case in which there was no privity of contract between the parties:

> Considering matters outside the pleadings, the court treated the government's motion to dismiss as a motion for summary judgment, in accordance with Rule 12(b) of the Court of Federal Claims ("RCFC").... We hold that there was no privity of contract between HUD and the Owners with respect to prepayment of the deed of trust notes.... The court should have granted summary judgment in favor of the government on the breach of contract claims.

*Cienega Gardens v. United States,* 194 F.3d at 1236, 1246; *see also Warr v. United States,* 46 Fed.Cl. at 348, 350 (when privity of contract is not established between the government and a tenant of Native American allottees, the government's motion to dismiss for failure to state a claim upon which relief can be granted would be treated as a motion for summary judgment, because the court considered matters outside the pleadings).

*Contract Disputes Act*

If the government had been found to be a party to the Farm Leases, an issue raised by the defendant for the court to resolve would be whether plaintiffs' claims are subject to the provisions of the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994). Section 602 of the Contract Disputes Act addresses the applicability of the Act, and includes leases. *See* 41 U.S.C. § 602(a); *Bonneville Assocs. v. United States,* 43 F.3d 649, 653 (Fed.Cir. 1994) (government procurement considered to be within the scope of the Contract Disputes Act includes leases); *Forman v. Unit-*

*ed States,* 767 F.2d 875, 876–79 (Fed.Cir. 1985) (a dispute relating to the United States Postal Service's subletting of premises previously leased to the Postal Service was within the scope of the Contract Disputes Act); *Colon v. United States,* 35 Fed.Cl. 337, 339–40 (1996) (when the government was the lessor of a restaurant, the requirements of the Contract Disputes Act applied to lease agreement disputes, citing *Forman v. United States,* 767 F.2d at 878–79 and *Hamza v. United States,* 31 Fed.Cl. 315, 320 (1994)).

Section 605 of the Contract Disputes Act provides that claims by a contractor against the government "shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Claims of more than $100,000.00, as in the instant case, must be certified by the contractor. 41 U.S.C. § 605(c)(1). The contracting officer is afforded the opportunity to issue a final decision on the claim, stating the reasons for the decision reached, and informing the contractor of the right to appeal the decision to a board of contract appeals or to the Court of Federal Claims. 41 U.S.C. §§ 605(a), 606, 609. Failure to submit a certified claim in accordance with these provisions also would have resulted in no jurisdiction in this court.

Defendant filed a motion to dismiss counts two through five for lack of jurisdiction over the subject matter, RCFC 12(b)(1), based in part on plaintiffs' failure to present a certified claim to a contracting officer for review under the Contract Disputes Act. Plaintiffs have not disputed this assertion nor addressed the applicability or inapplicability of the Contract Disputes Act. The record also does not reflect submission of a claim for consideration by a contracting officer. However, the issue is moot in light of the court's finding that there was no privity of contract between the parties, and, therefore, no contract claims cognizable under the Contract Disputes Act came into existence.

*Equitable Estoppel*

Count five of the amended complaint states that, "[t]he Fort Hall Agency of the BIA has accepted the terms of the crop share leases for at least ten years, and is equitably estopped from denying the existence and validity of the leases." Plaintiffs' position is that:

... [T]he Bureau of Indian Affairs entered into crop share leases with McNabb in 1987 and 1990, upon which leases McNabb farmed the land subject to the leases and participated in FSA programs relying upon the leases. At least six years into those leases, the Bureau of Indian Affairs first admitted then denied even the existence of the crop share leases. The BIA ultimately adhered to its denial of the existence of the lease, which significantly impacted the entire farming operation McNabb conducted on the Fort Hall Indian Reservation. Over the course of several years McNabb reasonably relied upon the ability to farm pursuant to the terms of the crop share leases.

The record reflects that the leasing arrangements between the parties have been characterized in various ways. The November 19, 1990 Farm Lease was discussed in a May 30, 1991 memorandum from the Realty Officer of the BIA's Fort Hall Agency to FSA. In the memorandum, the Realty Officer, after consulting with the BIA Superintendent and with John McNabb, who both signed the Farm Lease, characterized the BIA's role as "managers" of the leased property and trustee for Native American interests, acting on behalf of the individual allottees. In an August 14, 1996 letter from the Superintendent of the BIA's Fort Hall Agency to the FSA, the November 19, 1990 Farm Lease is described as a "valid crop share lease." In an August 20, 1996 letter from the Shoshone–Bannock Tribes to the BIA Portland Area Director "RE: McNabb Farms Crop Share Lease" [1991], the Chairman of the Tribes noted that the BIA Superintendent had signed the "option" to renew the lease, but stated that the Tribes had been "unaware of the lease" and did not approve the lease. Therefore, the Tribe objected to the "share crop lease" and believed it to be invalid. An October 8, 1996 letter from the Superintendent of the BIA's Fort Hall Agency to McNabb, refers to the leases at issue as "dry farm" leases and "cash" leases. The October 8, 1996 letter recognized the cash leases as being the official leases. The parties have stipulated that during a November, 1996 hearing before the FSA, the BIA Su-

perintendent who signed the Farm Leases testified that "we thought we were doing what was best for the [T]ribe," and that he believed, as the Superintendent of the BIA Fort Hall Agency, he had the "kind of authority to do what I needed to do for the best interest of the [T]ribal members here." In a June 7, 1997 memorandum from the Superintendent of the BIA's Fort Hall Agency to the BIA Portland Area Director, subject: "John McNabb's Unofficial Lease," the Superintendent stated that "[e]nclosed is a copy of the Farm Lease," referred to this unusual share cropping farm lease, "the agency leases are cash rental leases," that "there has never been any share-cropping lease consented to by the landowners or the Tribes," and that the leases were not the standard BIA lease nor on the standard BIA lease form.

Plaintiffs contend that the government should be estopped from denying the March 9, 1987 and November 19, 1990 Farm Leases, which contain language characterizing the Farm Leases as crop share leases, and, thereby, provide a basis for farm subsidy payments from the FSA. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The courts may use this doctrine in appropriate cases to prevent a "defendant from denying the existence of a contractual agreement." *Emeco Indus., Inc. v. United States*, 202 Ct.Cl. 1006, 1014, 485 F.2d 652, 657 (1973), *judgment entered*, 203 Ct.Cl. 759, No. 547–71, 1973 WL 12744 (Ct.Cl. Dec. 7, 1973). After rejecting an equitable estoppel argument against the federal government, the United States Supreme Court stated: "We leave for another day whether an estoppel claim could ever succeed against the Government." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 110 L.Ed.2d 387, *reh'g denied*, 497 U.S. 1046, 111 S.Ct. 5, 111 L.Ed.2d 821 (1990); *see also Frazer v. United States*, 288 F.3d 1347, 1352–53 (Fed.Cir.2002) ("[T]he precise circumstances under which a claim of equitable estoppel is available against the United States are not completely settled.").

Equitable estoppel against the United States government can only lie when the government agent whose actions were relied upon was acting within the scope of the agent's authority.

From our earliest cases, we have recognized that equitable estoppel will not lie against the Government as it lies against private litigants. In *Lee v. Munroe & Thornton*, 7 Cranch 366, 3 L.Ed. 373 (1813), we held that the Government could not be bound by the mistaken representations of an agent unless it were clear that the representations were within the scope of the agent's authority.

*Office of Pers. Mgmt. v. Richmond*, 496 U.S. at 419–420, 110 S.Ct. 2465; *see also S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed.Cir.1993) (it is "Supreme Court law that the United States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations."); *Yosemite Park and Curry Co. v. United States*, 217 Ct.Cl. 360, 370, 582 F.2d 552, 558 (1978) ("[T]he United States will not be estopped to deny the acts of its agents who have acted beyond the scope of their actual authority."); *Emeco Indus., Inc. v. United States*, 202 Ct.Cl. at 1015, 485 F.2d at 657 ("Of course, it is essential to a holding of estoppel against the United States that the course of conduct or representations be made by officers or agents of the United States who are acting within the scope of their authority."); *Northrop Grumman Corp. v. United States*, 42 Fed.Cl. 1, 8 (1998) ("Equitable estoppel forecloses the Government from denying the existence of a contractual liability, but cannot fabricate a contract that would not otherwise exist."); *Llamera v. United States*, 15 Cl.Ct. 593, 600 (1988) (The doctrine of equitable estoppel, when properly invoked, prevents a party from denying the existence of a contract that already exists; it cannot be used to create a contract that otherwise would not exist. ... [T]he authority of a government official to contract is a prerequisite to the formation of a contract in the first place. The doctrine of equitable estoppel, therefore, cannot be used to fill the gap resulting from an absence of authority to contract.) (citations omitted); *Federal Deposit Ins. Corp. v. Spain*, 796

F.Supp. 241, 245 (W.D.Tex.1992) ("The Supreme Court applies the bright line rule: if the government agent acts beyond the scope of his authority, a party cannot assert estoppel against the government," citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 380, 68 S.Ct. 1).[7] The authority of the BIA to approve contracts and enter into contracts on behalf of Native American allottees has been discussed above. Although plaintiffs have had the opportunity to demonstrate the BIA's authority to become a lessor and, therefore, a party to the contract under the circumstances at issue, plaintiffs have not done so.

Plaintiffs, however, citing the District Court case of *Rosebud Sioux Tribe v. Gover,* raise "affirmative misconduct"[8] on the part of the government in an attempt to support their estoppel argument. *Rosebud Sioux Tribe v. Gover,* 104 F.Supp.2d 1194 (D.S.D. 2000), *vacated on other grounds,* 286 F.3d 1031 (8th Cir.2002).[9] In *Rosebud Sioux,* Tribal land was leased to a private company for development of a hog production facility. A BIA official approved the lease. *Id.* at 1197. The Tribe and the developer expended approximately $5 million before the BIA withdrew its approval of the lease. The BIA withdrawal of approval was based on the belief that the BIA's original approval was void for failure to fully comply with federal environmental legislation. *Id.* at 1197–98. The Tribe and the developer then brought suit against the government. *Id.*

The District Court in *Rosebud Sioux* conducted an APA review, found "affirmative misconduct" on the part of the BIA, and held that the decision to withdraw approval of the lease at issue was "arbitrary, capricious, an abuse of discretion and was otherwise not in accordance with law," *id.* at 1204. The District Court recognized "that estoppel will rarely work against the government," citing *Office of Pers. Mgmt. v. Richmond,* 496 U.S. at 423, 110 S.Ct. 2465. *Rosebud Sioux Tribe v. Gover,* 104 F.Supp.2d at 1205. The court wrote:

> [T]he [District] Court finds the Assistant Secretary's unilateral decision to void the lease, with or without authority, after the period within which to appeal had expired, without providing any findings of fact or conclusions of law to justify or explain his decision, and without extending adequate due process to plaintiffs constitutes the requisite "affirmative misconduct." Further affirmative misconduct occurred in the Assistant Secretary filing a pleading in federal court one day and the next day

7. In addition, the four traditional elements a party asserting an equitable estoppel claim is required to establish are: (1) the government must have knowledge of the true facts; (2) the government must intend that its conduct will be acted upon, or act in a way that the party asserting the estoppel has a right to believe the conduct was intended to be acted upon; (3) the party asserting the estoppel must not have knowledge of the true facts; and (4) the party asserting the estoppel must rely on the government's conduct to his or her detriment. *JANA, Inc. v. United States,* 936 F.2d 1265, 1270 (Fed. Cir.1991) (citing *Am. Elec. Labs., Inc. v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985) and *Emeco Indus., Inc. v. United States,* 485 F.2d at 652, 657), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992). A party who is asserting an equitable estoppel claim against the United States government bears a heavy burden of proving the elements of equitable estoppel. *See Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* 467 U.S. at 61, 104 S.Ct. 2218.

8. *See Office of Pers. Mgmt. v. Richmond,* 496 U.S. at 421, 110 S.Ct. 2465 ("Our own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government.") (citations omitted); *Frazer v. United States,* 288 F.3d at 1354 ("'While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so, as has every other court of appeals.'") (citations omitted) (quoting *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed.Cir.2000)).

9. The United States Court of Appeals for the Eighth Circuit vacated the order of the District Court which granted a permanent injunction, and remanded the case with instructions to dismiss the complaint for lack of jurisdiction. *Rosebud Sioux Tribe v. McDivitt,* 286 F.3d 1031, 1040 (8th Cir.2002), *reh'g and reh'g en banc denied* (Aug. 14, 2002), *petition for cert, filed* (Nov. 2, 2002). Subsequent to the appeal, the Rosebud Sioux Tribe changed its Tribal Council, and its position, from that of an appellant to the government's position, leaving the lessee to pursue the case on appeal. The Eighth Circuit found that the lessee had no standing to bring the case. *Id.* at 1035, 1037, 1039–40.

taking the very opposite position, especially after having not reviewed any significant portion of the administrative record.

*Rosebud Sioux Tribe v. Gover*, 104 F.Supp.2d at 1205.

The case currently before this court is distinguishable from the *Rosebud Sioux* District Court opinion. First, the parties to the lease in *Rosebud Sioux* were the Tribe and the developer; the government official had an approval role. With the Tribe as a plaintiff in *Rosebud Sioux*, the District Court noted that, "[t]he federal government has a 'distinctive obligation of trust' with regard to Indian tribes." *Rosebud Sioux Tribe v. Gover*, 104 F.Supp.2d at 1205 (citing *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942)). In the present case, the Shoshone–Bannock Tribes are not plaintiffs, and, in fact, there is evidence in the record, discussed above, that the Tribes have objected to the crop share Farm Leases at issue. Furthermore, the issue in *Rosebud Sioux* concerned whether the BIA's approval of the lease, then withdrawal of that approval, was arbitrary or capricious under the APA, and also whether the government decision constituted "affirmative misconduct" for purposes of estopping the government's subsequent withdrawal of lease approval. On both grounds the District Court issued a permanent injunction, although reversed on appeal, permitting the development project on the Tribal lands to go forward. *Id.* at 1213. As discussed above, such remedies under the APA are available where the plaintiffs in *Rosebud Sioux* found them, in federal district court, not in this court.

Furthermore, the *Rosebud Sioux* decision turned on the BIA making an adverse decision without providing the Tribe and the developer notice and an opportunity to be heard, and, instead, acting unilaterally and arbitrarily against their interests. Plaintiffs in the present case, citing *Rosebud Sioux*, argue that:

For issues of equitable estoppel, the question becomes whether once granting the crop share leases, the BIA can then without notice or opportunity to be heard rescind that grant.... The BIA provided no finding of fact or conclusions of law to

justify its refusal to even acknowledge the existence of the leases, and provided McNabb absolutely no mechanism to contest the denial. Such lack of any fact finding or some type of administrative review or providing to McNabb an opportunity to contest the determination, constitutes affirmative misconduct.

The record reflects, however, that the McNabb plaintiffs were afforded and did pursue an administrative review through United States Department of Agriculture (Farm Service Agency) channels, which could have been judicially reviewed in federal district court under the APA, but such was not plaintiffs' chosen option. In the Department of Agriculture action, plaintiffs sought the restoration of crop payment subsidies from the FSA for the years 1996 and 1997. McNabb took advantage of the opportunity to be heard, with assistance of counsel, before the FSA. The record reflects a Power County FSA Office review of the crop payment subsidies on October 9, 1996; a November 22, 1996 hearing before the Power County FSA Office; a November 25, 1996 McNabb request for reconsideration; a December 5, 1996 reconsideration by the Power County FSA Office; a December 31, 1996 appeal to the Idaho State FSA Office by McNabb; a February 20, 1997 Idaho State FSA Office hearing, with an appearance by McNabb with counsel; a March 14, 1997 Idaho State FSA Office decision; an April 2, 1997 request for reconsideration by McNabb and counsel; a June 16, 1997 reconsideration by the Idaho State FSA Office; and an appeal to the Department of Agriculture National Appeals Division. However, the appeal to the agency's National Appeals Division was withdrawn by McNabb on October 6, 1998, and an APA review of a final Department of Agriculture decision was not sought by McNabb.

McNabb complains of no "opportunity to be heard," but vigorously pursued the opportunities to be heard within the Department of Agriculture described above. The record does not reflect similar attempts on the part of plaintiffs to use the administrative review procedures within the United States Department of the Interior (Bureau of Indian Af-

fairs) channels. *See* 25 C.F.R. §§ 2.2, 2.3 (1987); 25 C.F.R. § 2.4, 2.5 (2001). Nevertheless, on March 29, 1999, plaintiffs filed a complaint in the United States District Court for the District of Idaho, complaining about the action of the Department of the Interior (Bureau of Indian Affairs). Plaintiffs cited the APA in the complaint filed in the United States District Court for the District of Idaho, as well as in the amended complaint filed in this court. This court, however, has found no privity of contract between the parties, does not have jurisdiction for an APA review, and the record does not reflect that plaintiffs have sought and received a final agency administrative decision from the United States Department of the Interior (Bureau of Indian Affairs) which is ripe for judicial review.[10]

In *Rosebud Sioux,* the BIA official had authority to act, but the District Court found that the official had acted arbitrarily and capriciously. In the present case, plaintiffs have not demonstrated that BIA officials possessed the authority to make the government a lessor on leases of Tribal lands. There is no privity of contract between the parties in the present case before this court. Estoppel cannot establish a contract that does not exist due to the absence of authority of government agents to enter into that contract. Plaintiffs' equitable estoppel argument is rejected.

*Taking Claim*

█ Defendant also moves for summary judgment on count one of the amended complaint, which alleges that the BIA's refusal to acknowledge the existence of the March 9, 1987 and November 19, 1990 Farm Leases constitutes a taking of property. The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In its motion for summary judgment, defendant rejects plaintiffs' takings theory:

> [T]he McNabbs may not recover upon their takings claim because (1) the contractual rights that they allege were taken did not exist, and (2) assuming such rights existed, the BIA's actions did not cause the McNabbs' alleged injuries. In reality, the McNabbs lost their Federal crop subsidies for 1996 and 1997 because they engaged in a scheme to evade the limits upon such subsidy payments.

To redress an alleged breach of contract, courts are reluctant to embrace a takings analysis. The refusal to acknowledge a contract, or the repudiation or disavowal of a contract, is resolved in a breach of contract action. In this regard, the court in *Coast Federal Bank* wrote:

> Numerous courts have rejected attempts to classify deprivations of property rights created by contract as takings. In *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786 (1978), for example, the court found that "the concept of taking as a compensable claim theory has limited application" to contractual rights and that "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Id.* at 818. *See also Scan–Tech Sec., L.P. v. United States,* 46 Fed.Cl. 326, 341 (2000) ("When the Government asserts its interest in property obtained pursuant to a valid contract, no taking occurs and no obligation arises under the Fifth Amendment to compensate the contracting party.").

*Coast Fed. Bank v. United States,* 48 Fed.Cl. 402, 443 (2000) (footnote and citation omit-

---

**10.** In addition to surfacing in count five (equitable estoppel), plaintiffs' assertion that they were not afforded "notice and an opportunity to be heard" is found in count one (taking claim) and in count three, which complains of the BIA's arbitrary and capricious refusal to acknowledge the Farm Leases, and also alleges that the BIA "has not allowed McNabb an opportunity to an impartial hearing to contest the determination." However, the remedy for violations of the Due Process Clause of the Fifth Amendment is not money damages. The United States Court of Appeals for the Federal Circuit held in *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir. 1997), that the Court of Federal Claims is without jurisdiction over a Fifth Amendment due process violation. As to the claim in *Crocker* that the agency violated the plaintiff's right to notice, the Federal Circuit noted that the Court of Federal Claims "correctly held that it lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1994)." *Crocker v. United States,* 125 F.3d at 1476; *see also James v. Caldera,* 159 F.3d 573, 581 (Fed.Cir.1998), *reh'g denied* (1999).

ted), *modified,* 49 Fed.Cl. 11, *reconsideration denied,* 49 Fed.Cl. 53 (2001), *rev'd on other grounds,* 309 F.3d 1353 (Fed.Cir.2002); *see also Baggett Transp. Co. v. United States,* 969 F.2d 1028, 1034 (Fed.Cir.1992). As noted above, the United States Court of Claims stated in *Sun Oil Company v. United States* that a takings theory "has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract." *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978) (citation omitted). Under this analysis, the alleged interference with contract rights, or a repudiation or refusal by the BIA in the present case to acknowledge that it is a party to the Farm Leases, gives rise to a breach of contract claim, rather than a taking claim.

Even if a breach of contract rights could be vindicated under a takings theory, in reviewing what allegedly has been taken (contract rights), the absence of privity of contract is fatal to a takings theory. Because the court has found no privity of contract between the parties in this case, there are no contract rights to be taken by the government. As a result, a takings theory must fail. In response to defendant's motion for summary judgment on count one of the amended complaint, plaintiffs acknowledge that count one "sought relief upon an unconstitutional taking by the United States of various transfer payments pursuant to a program administered by the Farm Service Agency (FSA)." However, plaintiffs do not clearly address their claim as a standard taking claim in their response. Perhaps recognizing the fundamental defect in both contract and taking theories of recovery, plaintiffs merely renew their contention, addressed and dismissed earlier, that "[c]ontract law compels the conclusion that the BIA entered into the leases as a principal, and not simply an agent for the Indian allottees." Plaintiffs' contract arguments were not persuasive in the earlier review of their breach of contract theory, and are similarly unpersuasive in this consideration of a takings theory. *See United States v. Algoma Lumber Co.,* 305 U.S. at 422, 59 S.Ct. 267; *Sangre de Cristo Dev. Co. v. United States,* 932 F.2d at 895; *Warr v. United States,* 46

Fed.Cl. at 348–49; *Navajo Nation v. United States,* 46 Fed.Cl. at 235.

In further response to plaintiffs' taking claim, defendant argues that the BIA was not responsible for plaintiffs' loss of FSA crop payment subsidies. The above summary judgment analysis rejecting plaintiffs' takings theory renders this argument moot, however, the issue will be reviewed in the interest of addressing all arguments. Plaintiff argues that the BIA recognized as valid the cash leases, but not the crop share Farm Leases, and that, "[a]s a result of the denial of the existence of crop sharing leases, the FSA suspended all 1996 subsidy payments which would have been paid to McNabb Farms and the BIA . . . ."

Defendant responds that the BIA's refusal to acknowledge the existence of the Farm Leases was not the cause of the denial of crop payment subsidies by the FSA. The record supports defendant's view. The parties have stipulated that plaintiffs submitted the Farm Leases to the Farm Service Agency (FSA) of the United States Department of Agriculture to establish eligibility for the federal crop subsidy program. Plaintiffs' amended complaint seeks the "loss of U.S. government subsidies" on the Farm Leases. The parties have stipulated that in July, 1996, the Power County, Idaho FSA Office began an investigation into the plaintiffs' leases. On October 9, 1996, the Power County FSA Committee denied the plaintiffs' crop subsidy payments for 1996, due to the existence of plaintiffs having both cash leases and crop share leases on the same Tribal lands. Plaintiffs requested a further review, which was conducted by the Power County FSA Committee at an informal hearing on November 22, 1996. On December 5, 1996, the Power County FSA upheld its prior decision to deny crop subsidy payments to plaintiffs. Plaintiffs then sought review of the Power County FSA decision by the Idaho State FSA Office.

The Idaho State FSA Office conducted a hearing on February 20, 1997. McNabb was present, with counsel. The State FSA Office denied McNabb's appeal, concluding:

In the opinion of the State Committee, FSA was never informed by McNabb

Farms Partnership or the BIA of the cash advance being paid by McNabb Farms Partnership to BIA. By not providing this information it has the effect of evading payment limitation. According to [7 C.F.R.] § 1497.6 this shall be interpreted as Scheme or Device and the persons involved shall be ineligible for payments with respect to the year for which such scheme or device was adopted [1996] and the succeeding year [1997].

The BIA position on whether the leasing arrangements between the parties were properly characterized as cash or crop share varied, but the final BIA position was that the cash leases were the official leases. The record, however, reflects that the FSA crop payment subsidies were denied independently of the BIA's position on the crop share Farm Leases. The Idaho State FSA Office, in a March 14, 1997 letter to McNabb, denying McNabb's appeal of the denial of crop payment subsidies, stated that: "The Idaho State Committee in making their review did not feel that they should nor are they required to determine which document [cash lease or crop share lease] is the legal binding document between McNabb Farms Partnership and BIA." The record supports defendant's contention that the BIA's position on the crop share Farm Leases did not impact the FSA's decision to withdraw crop subsidies.

Plaintiffs requested reconsideration of the State FSA determination. However, the prior decision against McNabb was affirmed. Plaintiffs then appealed the unfavorable State FSA decision to the United States Department of Agriculture National Appeals Division. On October 6, 1998, the appeal was withdrawn by McNabb. The record does not reflect that the BIA's final characterization of the leasing arrangements as cash was the determinative factor in the County and State FSA's decision to deny crop subsidy payments. Plaintiffs takings theory is rejected because there was no privity of contract with the government and, therefore, no contract rights to take. Furthermore, the BIA's ultimate determination that the cash leases were the official leases with McNabb did not drive the FSA's independent determination at both the County and State levels, that both cash and crop share leases existed on the same Tribal lands, providing the basis for denying crop subsidy payments to McNabb.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on count one of the amended complaint is **GRANTED**, with prejudice. Defendant's motion to dismiss counts two through five for failure to state a claim upon which relief can be granted is treated by the court as a motion for summary judgment under RCFC 12(b) and 56, and is **GRANTED**. The Clerk's Office also shall dismiss plaintiffs' contract claims, with prejudice, and enter **JUDGMENT** for the defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**